Richard Stegall, Your Honor, for the Plaintiff Appellate, Dr. Larry Hooper. Summary judgment on Americans with Disabilities Act case. Tragic case involving a bipolar physician. There's two types of bipolar disorders. There's the mild one, which if you've got to have one, you'd want that. It's a little further on the continuum from depression and severe. He had had severe incidents, lost his whole life up in northern Wisconsin, was hired at Proctor for outpatient care facility. He was being super cautious. The Illinois State Medical Society required him to be able to practice, to have a primary care physician and a psychiatrist. So he goes to his treating psychiatrist and said, I'm getting a little irritable, I'm snapping at people. Her testimony was if he wasn't a physician, she wouldn't have put him off work. She put him on reduced work. And then on April 15th, then on May 13th, she releases him to return to work. He was being overcautious. In the meantime, he had gone to Proctor First Care, run by Proctor Hospital, and told their human resources department he asked about his disability benefits, what if this gets worse. There's an immediate reaction from Mandy Carbidillo about her in-law, who has bipolar, and how terrible it is. No follow-up questions are given to the treating psychiatrist about, well, okay, you've returned him to work. Are there any safety problems or what's your reasons? They go searching for, and they pay him, but they go searching for an independent medical exam, and they get a very qualified person to do it, James Cavanaugh. I've seen him in cases at Rush Medical College. He has a bad cell phone. They go back and forth. So it's finally scheduled on March 2nd and 3rd. Dr. Hooper goes. He testified, which was ignored by the district court on summary judgment, that Mandy Carbidillo told him that, well, we've got to receive Dr. Cavanaugh's report. That's the first item of summary judgment that was there. Judge Shadid took a position. Diane Kurtz of Proctor called the cell phone that there were problems at work. He said, you return to work the next day. Judge Shadid saw this as a case, well, he'd been off a long time. He was told to return to work. He didn't return to work for 19 days, so they fired him. Well, if that were the only evidence in the record, I'd say, yeah, well, we wouldn't have filed a notice of appeal. But that wasn't their evidence. First, there was Mandy Carbidillo's statement to Dr. Hooper that, well, you've got to wait on the report. Second, there's the fact of their sending him to a medical school professor to do an in-depth analysis. And Dr. Cavanaugh himself said, well, told Dr. Hooper, and he told them, he said, well, I'm going to do a report, and there are going to be accommodations in there. And there were four accommodations when he finally did his report. Well, of course, the ADA requires that disabilities be accommodated. Your client cut off the ability to accommodate by not showing up for work for 19 days. Well, he wasn't, if you take except his testimony from the admission from Proctor and Dr. Cavanaugh's testimony, he wasn't supposed to go back to work until he finished his report. And why do the report if he's returned to work immediately? He did look at the psychological report afterwards. There's an August 10th he called the treating psychiatrist. And so do we just write the report out of it? I mean, Cavanaugh thought it was an integral part of his examination, and they already had one return to work. If you're just looking for an oral. We're not litigating whether there was a misunderstanding about whether he was supposed to return to work. This is a disability discrimination claim, so he has to prove that they terminated him because of his disability. They terminated him for not showing up. They were willing to take him back and, in fact, had said that they would. They accepted Dr. Cavanaugh's report orally, even though they didn't have it in writing in hand just yet. And they told him he was cleared to return to work, and he could, and left numerous voicemails for him explaining all this, which he ignored. And so he was terminated for not showing up, not for disability discrimination. But aren't you reading out of the record that he was told by the HR? Again, the dispute is not whether he misunderstood what he was told, whether there was a reason why he ignored all of those messages. The dispute is whether there's any evidence of disability discrimination here. And, in fact, I don't see any because they were willing to take him back. And he refused to come back. Well, they weren't willing to take him back when they got the report. Well, except that the report cleared him to work without accommodations. No. And said that, in fact, he was qualified to return without accommodations. However, if he were to be given these additional accommodations, that would relieve his stress and make him more efficient. That, with respect, Dr. Kavanaugh didn't testify to that. He said he told him, yeah, I think you can return to work, but there are accommodations that I'm addressing in my report. He viewed them one and the same. A jury should certainly conclude that. Also, again, if you accept the interpretation, well, you put the blame on Dr. Hooper of, well, he overlooked it or he wasn't told, but if you drew the evidence in the light most favorable, he was told not to return until the report, which was two or three weeks. That's what he testified that Mandy Carbidello told him. And I don't see how you can read that evidence out of the record. That's an argument for wrongful termination. It's not an argument for disability discrimination. Well, we have her bias in the record for how she reacted about how bad bipolar was. Stray remark. That's not enough to get to a jury on a disability discrimination claim. Well, I have a problem with ruling out stray remarks because she's the one who kept me off work. I mean, she's given her reasons. I guess, yeah, we can just write that out of the record, but you're going to rule as you're going to rule. I don't see how you can ignore the two things, as the doctor himself thought the report was important. But I guess, you know, I think what you're asking us to do, though, is read into the record something that isn't there, which is that if he says that he's being fired because he has this disability, that you're asking us to take the facts of, as soon as they heard from Dr. Kavanaugh orally clearing him, they called him and said, come back to work, and kept calling to say, come back to work, that somehow we need to read into that some kind of twisted motive that they were setting him up to fire him. No, just a reasonable attempt by both sides to engage in an interactive process. They gave him a bad cell phone, which he complained about. He took what Mandy Carbadillo told him, don't return until the report. He asked Dr. Kavanaugh about the report, and they never reached out to him. They could have told him before he went there. Well, I guess where I'm failing to follow the logic is, so then why was he fired? Was it because they decided they didn't want to deal with someone who's bipolar? Well, there's certainly evidence to that. I mean, I would ask that if a physician who's in good standing, there's a miscommunication problem, the report comes in, clears and he comes in and says, yeah, I came in with the report that you're going to fire him. There was also evidence they had a seven-day grace period that you could go take these things, and they ignored it and didn't apply it. So, yeah, there is that evidence is that would a physician in good standing, taking all things equal, would they have done this? I don't see it. Did he go back within that seven-day window? Yes. He reported on the 24th, actually about when they got the report, and asked what's going on. I was told to wait for the report, and they refused to take him back, said you've been fired. Now, I don't see the interactive process working there. Even if you take wrongful termination argument, I mean, they're supposed to reach out. He does have some limitations in communications, and they had a bad cell phone that he tried to get them to correct. I see your timing. Thank you. Thank you. Ms. Clark. Thank you, Your Honor. May it please the Court. Anytime you're arguing on a reply, it's a little bit difficult to necessarily anticipate which arguments you're going to have to make, which ones you won't. I actually believe by the prior conversation that the Court is fully apprised of what the issues are here and how the facts shake out. I believe that I've represented Proctor's arguments in the brief in full. I don't wish to burden the record anymore. I do have a short argument that I could present to you today, but I would actually rather prefer to take your questions. If there are any questions that you have, I would like to address those up front. I have a question about the belated failure-to-accommodate argument. Yes, Your Honor. I mean, this was litigated at least initially as a termination claim. Yes. And then the issue of the failure-to-accommodate kind of got injected later on, and the district court didn't consider it because it wasn't in the complaint. And, you know, the rule is you don't have to plead legal theories in the complaint. And so perhaps some focus on the relative merits of the accommodation claim rather than the procedural issue would be appropriate. Absolutely, Your Honor. And by that, do you mean the substance of whether Proctor did or did not accommodate him? Right. I mean, it seems to me that generously reading our case law about no rule about pleading legal theories, you know, leaves this accommodation argument in the case rather than out of the case, as the district court thought. So whether there's enough here to support such a claim. Right. I think if we read the case law broadly, as broadly as you would have to do to see that in the complaint itself, I think that even assuming, let's say, Dr. Hooper had pled a failure-to-accommodate case, I'd have three responses on that. Well, I guess two if we put aside the pleading situation. But, Your Honor, to your point, Dr. Kavanaugh didn't say that these are accommodations, that Dr. Hooper needs to perform the essential functions of his job, which is what accommodation means, so that these are things that could possibly make him more successful, things like more time to develop relationships with management, more time to develop relationships with his fellow physician peers, things like that. These aren't accommodations that Dr. Hooper would need to perform the essential functions of his job. So I think right out of the gate, we don't really have accommodations in a legal sense here. And the second point that I would make on that is that, again, Dr. Hooper would not report to work. So even if Proctor was able to accommodate every single one of those suggestions that Dr. Kavanaugh had put to Amanda Carvalito, every single one, Dr. Hooper didn't show up to work to be accommodated. And counsel mentions the interactive process. Interactive means two people. Proctor can't engage in the interactive process by itself. And so Dr. Hooper never put these to Proctor. Proctor understood what the suggestions were from Dr. Kavanaugh. Mandy Carvalito has those down in her notes that you see in the record. She discussed those with Todd Baker, who is the director of ambulatory care services. They were fully apprised of what those were. Proctor can't implement any of those if Dr. Hooper does not show up for work. Any other questions that I can answer? Thank you for your time, Your Honors. You have two minutes. Thank you. Dr. Kavanaugh said they were modifications. I don't know where in the record you can make this distinction, that you can consider this case without his accommodations, modifications to his work. He testified that he told him that. His report says it. Of course, how can Dr. Hooper engage in any accommodation or any discussion when he doesn't know what it is? The question that I have follows from Judge Seitz's question about where in the complaint did she put Proctor on notice that there was a failure to accommodate claims? I provided all the facts, as your cases say you're supposed to do, which almost track what's on summary judgment, and I said he was a qualified individual with a disability and the statutory definition of a qualified individual is one with or without reasonable accommodations, and to perform an essential sentence of the job. So Judge Shadid read the reasonable accommodations out of the statute. So I did plead to qualified. Thank you, Counsel.